STATE

v.

Ronald HARNOIS.

No. 93–5–C.A.

Supreme Court of Rhode Island.

March 11, 1994.

Jeffrey Pine, Atty. Gen., Aaron Weisman, Chief, Appellate Div. (Lauren Sandler Zurier, argued), Providence, for plaintiff.

Andrew A. Bucci, Providence, for defendant.

## OPINION

SHEA, Justice.

The defendant, Ronald Harnois, was charged by criminal indictment No. P1/90–3713A on five counts: attempted murder, conspiracy to commit murder, possession of a bomb, fourth-degree arson, and bigamy. At the close of the state's evidence the court granted the defendant's motion for judgment of acquittal on the conspiracy count but denied the motion as to all other charges.[1] The defendant was convicted after a jury trial of the remaining four counts. He moved for a new trial. The motion was denied, and the defendant filed this appeal. We affirm.

At trial the victim, Joann Harnois (Joann), testified that she and defendant were married in February 1983. They purchased a home together and subsequently acquired life insurance policies for $75,000, each naming the other as beneficiary.

In September 1989 Joann joined a Woonsocket bowling league because defendant's team needed a fourth member. Tammy Petrin (Petrin) was one of the players on the team, and Joann became friendly with her. By late 1989, however, Joann had become suspicious of the relationship between defendant and Petrin as the two spent increasing amounts of time together. In December 1989 Joann received an anonymous telephone call indicating that defendant and Petrin were parked near Mount Saint Charles High School in Woonsocket. The defendant had told Joann that he was going Christmas shopping alone. As a result of the telephone call, Joann drove to Mount Saint Charles where she witnessed defendant and Petrin parked in defendant's car. When Joann later questioned defendant about the incident and broached the subject of divorce, defendant denied any romantic involvement with Petrin. She was satisfied with defendant's explanation.

In June 1990 Joann again "caught" defendant and Petrin together. When she confronted defendant, he again denied romantic involvement with Petrin and said that he did not want a divorce. The defendant then indicated that he would be amenable to divorce only if he got all the couple's property and if Joann would agree not to date any men after the divorce. She again accepted defendant's explanation.

On June 17, 1990, defendant's car broke down. Joann owned a 1982 Chevy Cavalier but would not allow defendant to drive it. On that day, and every day thereafter, Petrin began picking defendant up at 5:30 a.m. and driving him to Lincoln where he worked as a delivery truck driver for a pizza parlor. Petrin would then drop defendant off at his house at 5:30 p.m. so he could eat dinner and return for him at 6 p.m. The defendant and Petrin would allegedly spend the evening together at a friend's house, going over maps so defendant could learn his truck routes for the following day. Petrin would drop defendant off at his home at 11 p.m. Additionally, defendant and Petrin spent most Saturdays together in a bowling league. Petrin would never come into the Harnoises' house.

On or about August 1, 1990, defendant and Petrin's routine varied significantly. The

---

1. The state's key witness in the conspiracy charge was Tammy Petrin, defendant's bigamous second wife. On August 3, 1990, she gave a statement to the police implicating herself and defendant in the plot to murder Joann Harnois. Petrin was shot to death in Woonsocket, Rhode Island, on July 31, 1991. The trial justice would not allow Petrin's grand-jury testimony to be admitted at trial.

two left as usual in the morning and returned that evening at 5:45 p.m. On this night, however, Petrin entered the home with defendant. Petrin persuaded Joann to accompany her to the Lincoln Mall while defendant remained at home. Petrin drove the two women in her car. They returned to the Harnois residence at 7:30 p.m., at which time defendant told his wife that he and Petrin were going to a friend's house in Milville, Massachusetts, to look at maps. He also indicated that he might need Joann to pick him up later that night. After defendant and Petrin left, Joann drove her car to a local variety store a few minutes from her home where she ran a quick errand. She then returned home, where she remained until defendant called at 10:45 p.m. He asked Joann to come pick him up at his friend's house in Milville and told her that he had left directions on a sheet of paper that was stuck in the phone book. Joann retrieved the directions, read them back to defendant over the telephone, then left to pick up defendant.[2] This was the first occasion on which Petrin did not drive defendant home.

While driving in Woonsocket, Joann heard a loud bang under her car. A driver in a car behind her, who testified at trial, shouted to her to get out of the car because it was leaking gasoline. She pulled the car over, got out of the vehicle, and crossed the street.

The Woonsocket police arrived on the scene almost immediately. The officers retrieved numerous explosive devices from the scene. Experts determined that the explosion was caused by a partially exploded pipe bomb that did not detonate as planned. An additional unexploded device was found attached under the driver's side of Joann's car. As a result of the explosion, the two rear tires of the vehicle were blown out, the tail pipe was severed in half and full of holes, and the gas tank was badly damaged. Joann accompanied the officers to the police station, where she gave consent for police to search her home. Police seized coils of wire, cutting tools, a wrench, pliers, fireworks casings, and residue-coated paper from defendant's tool chest and workshop area in the basement of the Harnois home. The items were subsequently turned over to officers from the United States Treasury Department, Bureau of Alcohol, Tobacco and Firearms (ATF).

At trial the state produced numerous expert witnesses from the ATF. Their testimony indicated that the wire used in construction of the bombs was of the same physical construction as the wire seized from defendant's tool chest, the Teflon tape used to secure the end caps of the pipe bombs was of the same physical construction as the tape seized from defendant's tool chest, three of the four cuts on the wire used in the bombs were made by the electrician's pliers taken from defendant's tool chest, the piece of solder holding the cigarette used as the delayed-fuse mechanism was also cut by the electrician's pliers, and another piece of wire used in the bomb was cut by a stripper/wirecutter type of tool seized from defendant's tool chest.

In addition, two witnesses testified that prior to the incident defendant had spoken to them about "getting rid of his wife." A friend of defendant's testified that he had asked defendant why he did not divorce Joann so he could be with Petrin. The defendant allegedly responded that he did not want a divorce, that he "[had] too much to lose [and he had] an easier way." The friend also testified that defendant had asked him to purchase gun powder for him during the summer of 1990.

Another acquaintance of defendant's testified that defendant had asked him if he knew anyone who could "get rid of" his wife and offered him $10,000 to do it. The friend thought defendant was kidding. The friend also testified that on the day after the incident, he and defendant unsuccessfully tried to retrieve Joann's car from the garage in Bellingham, Massachusetts, where it was being held.

The city clerk for the city of Woonsocket testified as to the authenticity of the marriage certificate of defendant and Joann as well as a marriage certificate dated May 26, 1989, of Tammy Petrin and Roland Harnois, the alleged twin brother of defendant. The clerk further testified that if defendant had a

---

2. The directions were later determined to lead to the Milville variety store.

twin brother, his birth certificate would have so indicated, which it did not.

The defendant did not testify.

On appeal defendant first asserts that he was unduly prejudiced by the trial court's refusal to allow his attorney to define "reasonable doubt" for the jury in his closing argument. He claims that by denying counsel the right to allude to the law in his closing, the court essentially deprived him of effective assistance of counsel.

■ Although Rhode Island has not directly addressed this issue, it is a well-established principle that only the court instructs the jury on the law. We take this opportunity to declare specifically that only the court has the authority and the responsibility to define "reasonable doubt" and any other rule of law. Many jurisdictions have addressed this specific issue and have held that trial attorneys are not permitted to define "reasonable doubt" to juries. *See United States v. Kramer,* 711 F.2d 789, 794–95 (7th Cir. 1983)(if jury instruction defining "reasonable doubt" to be given, it is the court's exclusive duty to do so); *Mathis v. State,* 497 So.2d 231, 233–34 (Ala.Crim.App.1986)(judge precluded counsel from defining "reasonable doubt" to jury to avoid confusion); *People v. Garcia,* 103 Ill.App.3d 779, 784–85, 59 Ill.Dec. 477, 482, 431 N.E.2d 1234, 1239 (1981)(improper for attorney to define "reasonable doubt"); *Commonwealth v. Snow,* 30 Mass. App.Ct. 443, 447, 569 N.E.2d 838, 841 (1991)(court's exclusive province to define "reasonable doubt"). The trial justice was absolutely correct in prohibiting defense counsel from defining "reasonable doubt." In doing so, he did not deprive defendant of his right to effective assistance of counsel. Additionally the judge took the precaution of issuing a curative instruction to the jury, in which he fully explained why he had limited defense counsel's closing argument.

The defendant next alleges that the trial justice erred by excluding statements defendant made to police that were contained in the police records. After the incident, defendant made statements to the investigating officers regarding his whereabouts on the night of the incident. At trial he attempted to introduce those statements through the Woonsocket police officers who had recorded them. The trial justice excluded the statements.

■ The defendant proposes two rules under which the statements should have been admitted. He first claims that the statements should have been admitted under Rule 801(d)(2)(B) of the Rhode Island Rules of Evidence. The rule states:

"A statement is not hearsay if * * * [t]he statement is offered *against* a party and is * * * a statement of which the party has manifested his or her adoption or belief in its truth." (Emphasis added.)

This rule is clearly inapplicable. The defendant did not adopt the statement—he issued it. It was offered for his own purpose—to establish reasonable doubt by establishing his whereabouts on the evening of the incident. This use would not fall within the parameters of the rule.

■ In the alternative, defendant asserts that the statements were admissible under Rule 803(24) of the Rhode Island Rules of Evidence. This catchall hearsay exception can be used to admit:

"A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."

However, this exception is "not to be used as a device for allowing a defendant to prove material facts through affidavit or unsworn statements as a substitute for his own testimony merely because such statements have found their way into an agency record." *State v. Germano,* 559 A.2d 1031, 1037 (R.I. 1989).

The defendant did not take the stand at trial. He may not testify by other means, including by way of the unsworn statements

made to police. *Id.* at 1036–37. By choosing to exercise his Fifth Amendment right, defendant waived all rights to testify. To admit defendant's statements under either rule would be to ignore the rules' well-established and unambiguous guidelines. The defendant was seeking to offer testimony through his statements, which might raise reasonable doubt in the minds of a jury, yet would deprive the state of the opportunity of cross-examination. The rules of evidence will not be manipulated in this way.

The defendant next contends that the trial justice erred by denying his motion for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. He argues that all the state's evidence was circumstantial and therefore insufficient to establish proof beyond a reasonable doubt. This argument is without merit.

Rule 29(a) states in pertinent part:

"The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, information, or complaint after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such * * * offenses."

"When presented with a motion for judgment of acquittal, a trial justice must determine whether the evidence offered by the state is capable of generating proof of guilt beyond a reasonable doubt. * * * To make this determination, a trial justice, and this court on review, must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, and must draw therefrom all reasonable inferences consistent with guilt." *State v. Caruolo,* 524 A.2d 575, 580–81 (R.I. 1987); *see also State v. McGranahan,* 415 A.2d 1298, 1301 (R.I.1980).

■ It is well established that circumstantial evidence alone may be sufficient to prove guilt beyond a reasonable doubt. *Caruolo,* 524 A.2d at 581. In this case the trial justice applied the proper standard of review and was satisfied

"that this jury can find on evidence and proof beyond a reasonable doubt that this defendant did assault Joann Harnois on or about August 1, 1990 and did so with the intent to murder her * * * that this defendant did have possession of those explosive devices which [could be] characterized as a bomb * * * and they can make that conclusion beyond a reasonable doubt * * *. And it is obvious here that the vehicle owned by Mrs. Harnois was damaged as a result of an explosive device and it is obvious here that the jury could conclude [that] that explosive device was placed onto her vehicle * * * for purposes of destroying or damaging it * * * and the jury could rightfully draw a reasonable inference in favor of the state that the value of the vehicle exceeded $100.00. As to the bigamy charge * * * the jury [could] draw reasonable inferences and conclude on the evidence and proof beyond a reasonable doubt that Ronald was Roland, and Roland was Ronald. * * * [And] while this defendant, Ronald Harnois, was legally married to Joann Harnois, that he entered into another marriage with Tammy Petrin."

An independent review of the record by this court indicates that the state produced overwhelming evidence to establish guilt beyond a reasonable doubt. The state unquestionably met its burden, and the trial justice properly denied defendant's motion for judgment of acquittal.

■ The defendant next contends that the trial justice erred by denying his motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, which states in pertinent part:

"The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice, except that a new trial may not be granted for error of law occurring at the trial."

When considering a motion for new trial in a criminal case, "a trial justice must determine whether the evidence at trial was sufficient to support a jury's verdict of guilt beyond a reasonable doubt." *Caruolo,* 524 A.2d at 585. To make this determination, the trial justice must assume the role of a "super juror" and exercise independent judgment as to the credibility of witnesses and the weight of the evidence. *State v. Henshaw,* 557 A.2d 1204,

1208 (R.I.1989). If the trial justice determines that the evidence produced at trial is sufficient to support the jury's verdict, or if reasonable minds could differ, the motion must be denied. *Id.; McGranahan,* 415 A.2d at 1302.

This court will defer to the trial justice's ruling on a motion for new trial unless the decision is clearly wrong, or in reviewing the evidence, the trial justice overlooked or misconceived relevant and material evidence. *State v. Dame,* 560 A.2d 330, 332–33 (R.I.1989).

The trial justice was

"satisfied that each and every one of the witnesses who testified in this case told the truth * * * [and was] satisfied beyond any question whatsoever that [the bombs] were put there by this defendant * * * [that] he certainly committed an overt act toward the commission of the crime that he intended * * * to get rid of his wife."

The trial justice further accepted all expert testimony as totally credible and was satisfied beyond a reasonable doubt that defendant was guilty of each crime as charged.

Following our review of the evidence, we would have no basis to conclude that the trial justice was clearly wrong or that he misconceived material and relevant evidence. He was fully justified in denying the defendant's motion for a new trial.

For all these reasons the defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers of the case are remanded to the Superior Court.

### ADDENDUM

We did not delay consideration of this case as we might have to order a new brief by the defendant's counsel which would have complied with Rule 16 of the Supreme Court Rules of Appellate Procedure. We chose, in view of the sentence imposed upon the defendant, to consider the merits of his appeal despite the condition of his brief. However, we take this opportunity to iterate that briefs must comply with Rule 16, which requires that the briefs are sufficient to make the court more knowledgeable on the merits of the appeal and the relevant law.

*Devereaux v. Kelly,* 106 R.I. 499, 501, 261 A.2d 843, 844 (1970); *Clarke v. Sullivan,* 103 R.I. 177, 178, 235 A.2d 668, 669 (1967).